```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         NORTHERN DIVISION
```

ROGER D. TAYLOR,                )
                                )
            Plaintiff,           )
                                )
       v.                        )         No. 2:09 CV 59 DDN
                                )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                )
            Defendant.           )


**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Roger D. Taylor for disability insurance benefits under Title II of the Social Security Act, and supplemental security income under Title XVI of the Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the ALJ's decision is affirmed.


**I.  BACKGROUND**

Plaintiff Roger Taylor was born on April 2, 1966. (Tr. 19.) He is 6'3" tall, and weighs approximately 340 pounds. (Tr. 20.) He lives with his mother and has three children. (Tr. 31, 92.) He completed high school and received two years of vocational training in auto mechanics. (Tr. 19.) He last worked as a punch press operator at Dura Automotive in July, 2005. (Tr. 21.)

On June 8, 2007, Taylor applied for disability insurance benefits, alleging he became disabled on July 1, 2005, on account of complications from a broken left leg and problems with his knee. (Tr. 91, 113.) He received a notice of disapproved claims on August 6, 2007. (Tr. 44-48.) After a hearing on May 19, 2009, the ALJ denied benefits on June 30, 2009. (Tr. 16-42, 9-15.) On September 25, 2009, the Appeals Council

denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. ADMINISTRATIVE RECORD

On July 9, 1998, Taylor was treated for low back pain by Kristin Malaker, MD, in the Emergency Department of Boone Hospital Center, after he was involved in an auto accident. (Tr. 385.) Taylor reported that he had a history of low back pain, but was successfully treating it with physical therapy. (Id.) Taylor reported no neck pain, and Dr. Malaker diagnosed Taylor with back strain and myofascial pain. (Tr. 383.)

On July 14, 2005, Taylor was working cutting timber for firewood when a tree fell on his left leg, causing his left tibial plateau to fracture. (Tr. 264-98, 303-04, 327-58, 362-67, 373-74.) Peter Kazmier, MD, operated on Taylor to reduce the internal fixation of the fracture. (Id.)

Dr. Kazmier's follow-up reports from August 4, 2005, September 1, 2005, October 6, 2005, December 8, 2005, and May 18, 2006, state that Taylor healed well and only had occasional pain. (Tr. 317-26, 375-76.) Taylor wore a brace and gradually began bearing weight on his knee. (Id.)

On August 4, 2005, John Haltom, Jr., MD, examined Taylor at the University of Missouri University Hospital. (Tr. 262-63.) Dr. Haltom's report states that Taylor had been doing reasonably well at home, had been keeping weight off his leg, and that his pain was well controlled. (Tr. 262.) Dr. Haltom told Taylor to continue to wear the brace at all times, and to continue keeping weight off his leg. (Tr. 263.)

On September 1, 2005, Dr. Kazmier noted that Taylor was doing well, had no complaints, and had been working with therapists at home. (Tr. 259-261.) Dr. Kazmier also noted that Taylor had almost fallen on his leg a few times, that Taylor needed to continue not bearing weight on his leg, and that Taylor needed to continue physical therapy and strengthening exercises. (Tr. 260.)

On October 6, 2005, Dr. Kazmier told Taylor to begin bearing weight on his left leg, and to wear a brace as he began to walk more. (Tr. 256-

58.)  Dr. Kazmier excused Taylor from work, and prescribed him Percocet[1] for pain.  (Id.)

On December 8, 2005, Dr. Kazmier noted that Taylor was having difficulty walking without assistive aids because of his weight, and was having occasional pain.  (Tr. 254-55.)  Dr. Kazmier told Taylor to continue bearing weight using while using assistive aids, and to wean the use of crutches over the next few months.  (Id.)

On February 23, 2006, Raj Kakarlapudi, MD, of the University of Missouri University Hospital, noted Taylor's complaints of left knee pain.  (Tr. 251-53, 314-16.)  Although Taylor was able to bear his full weight on the knee, Dr. Kakarlapudi noted tenderness to palpation over his knee joint line and positive McMurray's suspicion of meniscal pathology.[2]  (Id.)  Dr. Kakarlapudi scheduled a left knee arthroscopy for the next day.  (Id.)

On February 24, 2006, Dr. Kazmier performed the arthroscopy and derangement on Taylor's left knee with no complications.  (Tr. 247-50, 309-13.)

On March 23, 2006, David Greenberg, MD, examined Taylor following the arthroscopy.  (Tr. 245-46, 307-08.)  Dr. Greenberg's report states that Taylor's pain was controlled, that Taylor had no specific complaints, and that Taylor was slowly improving.  (Tr. 245, 307.)  Dr. Greenberg told Taylor to now stop using the knee brace, to transition off using crutches, and to resume his normal activities as much as he can progressively tolerate.  (Tr. 246, 308.)

On April 17, 2006, Taylor saw John Harvey, MD, for treatment for knee pain.  (Tr. 412.)  Dr. Harvey recommended that he do more physical therapy and possibly use a different brace.  (Id.)  Dr. Harvey told

---

[1]Percocet is a combination medication used to help relieve moderate to severe pain.  It contains a narcotic pain reliever (oxycodone) and a non-narcotic pain reliever (acetaminophen). Oxycodone works in the brain to change how the body feels and responds to pain.  Acetaminophen can also reduce a fever.  http://www.webmd.com/drugs/ (last visited January 24, 2011).

[2]A McMurray test is done by rotating the tibia on the femur to determine injury to meniscal structures.  Stedman's Medical Dictionary 1956 (28th ed. 2006).

Taylor that he would probably need a total knee replacement sometime in the future. (Id.)

On May 18, 2006, Dr. Kazmier noted that Taylor was having persistent pain, and that his brace did not fit. (Tr. 243-44.) Dr. Kazmier sent him to be fitted for a new brace and recommended that he lose weight. (Id.)

On July 3, 2006, Bradley Crow, MD, examined Taylor at the University of Missouri University Hospital. (Tr. 240-42, 370-72.) Dr. Crow's report stated that Taylor was doing relatively well since his last visit, and consistently wore a brace. (Id.) Although Taylor had not yet gone back to work, he had gone shopping and had painted tractors, and sought to return to work. (Id.) Dr. Crow recommended weight loss and possibly performing another arthroscopy, and noted that a total knee replacement may be necessary in the future. (Id.) Dr. Crow gave Taylor a form stating that he could return to work, so long as he wore a brace, prescribed him Celebrex, and recommended that he use a soft pad under his feet while working. (Id.)

On October 5, 2006, Allison Wade, MD, examined Taylor at the University of Missouri University Hospital. (Tr. 238-39, 368-69.) Dr. Wade's report states that Taylor had pain in his left knee, and was unable to work. (Id.) Taylor stated that he had extreme pain and swelling after he tried to resume his work in the factory because his job demanded that he stand on concrete for 12 hours. (Id.) Taylor was wearing a brace for stability because otherwise he had no stability and feet like his knee was caving inward. (Id.)

Dr. Wade noted that Taylor had a slight antalgic limp, but had only minimal effusion and no tenderness along the medial or lateral joint line. (Id.) Taylor's range of motion was from 0 to 105 degrees of flexion, and was neurovascularly intact except for a small patch of skin on the lateral aspect of his leg. (Tr. 238-39, 368-69.) Dr. Wade noted that Taylor felt a decreased sensation in his knee, but otherwise that his deep peroneal, superficial peroneal, sural, saphenous, and plantar nerves were intact, as were his extensor hallucis longus, flexor hallucis longus, dorsiflexion, and plantar flexion. (Id.) Dr. Wade also noted that Taylor's knee ligaments were stable. (Id.) Dr. Wade diagnosed left

knee pain status post tibial plateau fracture open reduction, internal fixation. (Id.) Dr. Wade recommended Taylor exercise, try to lose weight, and continue taking Celebrex.[3] (Id.) Dr. Wade encouraged Taylor to apply for vocational rehabilitation, discussed using a steroid injection, which Taylor declined, and told Taylor to return as-necessary. (Id.)

A Vocational Rehabilitation Eligibility Certification report from December 13, 2006, stated that Taylor had a physical or mental impairment qualifying him for rehabilitation services. (Tr. 147.) The report also stated that Taylor's impairments precluded him from returning to work or other positions requiring prolonged periods of standing, and that Taylor did not have transferable work skills for sedentary work. (Id.) The report listed Taylor's functional limitations as including: walking or standing for a maximum of 2-3 hours every 8 hours; crouching; crawling; kneeling; climbing; running; jumping; occasional or less frequent pushing with the left lower extremity. (Id.) The Evaluation Staffing Summary stated Taylor's physical limitations were related to leg and knee problems, and included difficulty in standing; sitting; walking; needing to avoid lifting; carrying; and climbing. (Tr. 152.) The Summary also stated that Taylor has weak language skills, weak verbal ability, computation, motor coordination, finger dexterity, and manual dexterity, and that when learning new skills, Taylor needed to be explicitly taught everything and given ample opportunity for practice. (Id.)

On March 20, 2007, Taylor sought treatment from the Family Health Center. (Tr. 379-380.) The notes of Sharon Carmignani, MD, state that Taylor had a nervous breakdown two weeks prior and was crying, although Taylor did not have persistent depression symptoms and did not want to take an antidepressant. (Tr. 379.) Dr. Carmignani found that Taylor had some low-grade depression. (Id.) Taylor reported left knee and right hip pain, particularly when walking on concrete, despite wearing a knee

---

[3]Celebrex is a nonsteroidal anti-inflammatory drug that relieves pain and swelling (inflammation). It is used to treat arthritis, acute pain, and menstrual pain and discomfort. The pain and swelling relief provided enables the patient to perform more of his normal daily activities. http://www.webmd.com/drugs/ (last visited January 24, 2011).

- 5 -

brace and having surgery on his hip years prior. (<u>Id.</u>) Dr. Carmignani noted that Taylor had a diminished range of motion of his left knee, and a good range of motion of his right knee. (<u>Id.</u>) Taylor was also interested in bariatric surgery[4] to lose weight and help take pressure off of his joints. (Tr. 380.)

A Vocational Evaluation Report from October 28, 2007, stated that Taylor was limited by knee pain, and that he needed a new brace. (Tr. 220-26.) Taylor expressed interest in finding a job that he could perform while sitting, but that finding a factory job that can be done while sitting was difficult. (Tr. 221.)

**Testimony at the Hearing**

On May 18, 2009, Taylor testified before the ALJ. He last worked as a punch press operator at Dura Automotive in July, 2005, and can no longer do so because the job requires that he stand for eight hours a day and lift objects weighing up to 60 pounds, neither of which he can do because of a knee injury from a logging accident. (Tr. 20-23.) He tried to return to work sometime around July, 2007, but could not walk for three days after working one day. (Tr. 21.)

Regarding the logging accident, Taylor broke his fibula and tibia when a limb fell on his leg, requiring corrective surgery. (Tr. 23-24.) Before the accident, he already had knee and hip problems from standing on concrete for extended periods of time. (<u>Id.</u>) He could not put any weight on his left knee for six months after the surgery. (Tr. 25.) The doctors put screws and a steel plate in his leg instead of doing a total knee replacement because he was too young at the time for a total knee replacement. (Tr. 25-26.) He had a second surgery in which the doctors cut some of his knee cartilage so that his knee would bend properly. (Tr. 26-27.) As a result, he has more knee pain. (Tr. 27.) He also has problems with his right knee because he puts more weight onto

---

[4]Bariatric surgery is a weight-loss surgery that works by either (1) restricting the amount of food the patient's stomach can hold; (2) preventing the patient's digestive system from absorbing all the nutrients in the food he or she eats; or (3) a combination of these. http://www.webmd.com (last visited January 24, 2011).

it to compensate for his left knee; he occasionally has problems with his hip; and he has a history of severe back pain. (Tr. 27)

Taylor also testified that walking and sitting cause him the most pain, and that his legs swell after he drives. (Tr. 29.) The heaviest thing he lifts is a gallon of milk, although he could lift 20 pounds occasionally. (Tr. 29.) He can only stand on a solid surface for 5 or 10 minutes before having pain in his knee, hip, and back, or 20-30 minutes on a grassy surface. (Tr. 30-31.) When he is at home, he sits or lays down on the couch, although sitting bothers his neck. (Tr. 31.) He has difficulty sleeping because of his back. (Id.)

When his children are with him, Taylor's mother does the cooking, vacuuming, sweeping, laundry, and the dishes, although he does make sandwiches and carries things from the table to the sink. (Tr. 32.) He does not do the dishes because he might drop and break them, and he would be able to stand at the sink for less than 30 minutes. (Tr. 33.) He sometimes goes with his mother to the grocery store, but he does not go into the store because he might fall. (Id.) While at home, he watches television and plays card games with his children, and took his children to ball practice until his oldest child began driving. (Tr. 33-34.) He can watch television for 20-30 minutes before he needs to change positions, and so he usually sits or lays on the couch or lays on his bed while watching television. (Tr. 34.) He is most comfortable laying down on his side or on his back. (Tr. 36.)

Taylor also testified that when he sits, his leg goes numb from his knee to his ankle. (Id.) At times, it also feels like someone had a 20-pound bowling ball putting pressure on the center of his back. (Id.) Because he gets the most relief from the pain when laying down, he spends more than half of the day laying down. (Id.) At the time of the hearing, he was not receiving any medical treatment or taking any medications because he could not afford to do so. (Tr. 37.)

Since the accident, Taylor has been more of a hermit, and often feels worthless. (Tr. 36-37.) He tried to work with Vocational Rehabilitation, but was unsuccessful because of his limitations from his injury. (Tr. 37-38.) He has some difficulty reading and spelling, although he can read a newspaper. (Tr. 39-40.) He was in special

education in school, and had seizures when he was 18 months old. (Tr. 40.) He normally has someone else read things over for him. (Id.)

### III. DECISION OF THE ALJ

The ALJ found that Taylor had the severe impairment of status post open reduction internal fixation of a fracture comminuted lateral left tibial plateau fracture. (Tr. 11.) But, the ALJ found that Taylor retained the residual functional capacity (RFC) to perform the full range of sedentary work. (Id.) In reaching this conclusion, the ALJ relied on Taylor's testimony and the objective medical evidence. In particular, the ALJ found that Taylor's impairments could produce the alleged symptoms, but that Taylor's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible. (Tr. 11-14.)

Although Taylor testified that his legs swell and that he can only sit 20 or 30 minutes at a time, the ALJ expressly gave greater weight to the medical record than to Taylor's testimony.

The ALJ relied on treatment notes from Taylor's emergency room visit in July, 1998, in which Taylor stated that, although he had low back pain then and had a history of low back pain, he had been undergoing physical therapy and doing well. The ALJ also considered Taylor's July 14, 2005 surgery, an open reduction internal fixation of his fractured left tibial plateau, and Taylor's February 24, 2006 left knee arthroscopy and derangement by Dr. Kazmier. The ALJ recognized Dr. Wade's notes regarding Taylor's knee pain and knee instability, and that Dr. Wade found Taylor's knee ligamentously stable, and advised him to lose weight, exercise, and continue taking Celebrex. The ALJ also noted Dr. Carmignani's report, which stated that Taylor was wearing his knee brace, had a diminished range of motion in his left knee, and was interested in bariatric surgery to lose weight. (Tr. 12-15.)

The ALJ found that Taylor's lack of medical treatment for knee pain since March, 2007, suggested that his symptoms were not as severe as he alleged. (Tr. 14.) The ALJ also found that none of Taylor's treating or examining physicians stated that he was disabled and unable to work,

which detracted from the credibility of Taylor's subjective complaints. (Id.)

The ALJ found that Taylor's impairments and associated symptoms prevented him from engaging in strenuous activities, but did not prevent him from performing sedentary work activities. (Tr. 14.) As such, Taylor could not perform his past relevant work, that of a punch press operator, because it involves prolonged standing and lifting more than 10 pounds. (Id.)

The ALJ applied the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Part 404, Subpart P, App'x 2, to Taylor's RFC, age, education, and work experience. (Tr. 15.) In doing so, the ALJ found that Taylor was not disabled under Grid Rule 201.28. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Taylor could not perform his past relevant work, but that he maintained the RFC to perform sedentary work in the national economy.

## V. DISCUSSION

Taylor argues the ALJ's decision is not supported by substantial evidence. First, Taylor argues that the ALJ failed to consider his nonexertional impairment, pain, which prevents him from performing sedentary work activities. Second, Taylor argues the ALJ erred in using the Grids instead of calling a vocational expert (VE). (Doc. 17.)

**A. Nonexertional Impairments**

The ALJ expressly found that Taylor's impairments and resulting symptoms precluded him from engaging in strenuous activities, but did not preclude him from performing sedentary work. The ALJ also found that Taylor's testimony to the contrary was not credible, and gave greater weight to the objective medical evidence than to Taylor's testimony. (Tr. 11-14.)

When weighing a claimant's testimony, the ALJ must take into account the Polaski factors, which include: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and

- 10 -

aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). However, the ALJ's decision need not discuss the relation of every Polaski factor to the claimant's credibility. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

The credibility of a claimant's subjective testimony is primarily a decision for the ALJ, not the courts. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001). While an ALJ may not disregard subjective complaints solely because they are not fully supported by medical evidence, the ALJ may discount such complaints if they are inconsistent with objective medical findings. Ramirez v. Barnhart, 292 F.3d 576, 582 (8th Cir. 2002). Deference is given to the ALJ's credibility determinations so long as they are supported by good reasons and substantial evidence. Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005).

The ALJ considered a number of factors before determining that Taylor's subjective complaints were not fully credible. (Tr. 12-14.) The ALJ noted that the objective medical evidence was inconsistent with Taylor's reports of disabling symptoms. (Tr. 14.) On July 9, 1998, Taylor stated that he had a history of back pain, but that he was successfully treating it with physical therapy. (Tr. 383-85.) After his July 14, 2005 logging accident and subsequent surgeries, Taylor had only a slightly antalgic limp, minimal effusion, and no tenderness along his medial or lateral joint line. (Tr. 238-39, 368-69.) His nerves were generally in tact, as were his ligaments. (Id.) He had a diminished range of motion in his left knee, and a good range of motion in his right knee. (Tr. 379-80.) He was advised to exercise, lose weight, and apply for vocational rehabilitation. (Tr. 238-39, 368-39.) Taylor never reported that disabling knee pain or other symptoms manifested while he sat. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (although an ALJ may not discount allegations of disabling pain solely on the lack of objective medical evidence, a lack of objective medical evidence is a factor an ALJ may consider in determining a claimant's credibility).

The ALJ also noted Taylor's lack of medical treatment for knee pain since March, 2007. (Tr. 14.) An ALJ may discredit a claimant's credibility because of his failure to seek medical treatment. Torres v. Astrue, 372 Fed. App'x 683, 683 (8th Cir. 2010) (per curiam).

Taylor testified that he was not receiving any medical treatment or taking any medications because he could not afford to do so. (Tr. 37.) An inability to pay may justify a claimant's failure to seek medical care. Vasey v. Astrue, No. 1:08 CV 46 SWW/JTR, 2009 WL 4730688, at *5 (E.D. Ark. Dec. 3, 2009); Skovlund v. Astrue, No. CIV 08-4078, 2009 WL 3055421, at *24 (D.S.D. Sept. 24, 2009). However, a claimant must present "supporting evidence" that his failure to seek medical treatment was due to the expense. George v. Astrue, 301 Fed. App'x 581, 582 (8th Cir. 2008) (per curiam). See also Carrigan v. Astrue, No. 4:08 CV 4018, 2009 WL 734116, at *6-7 (W.D. Ark. Mar. 17, 2009) (claimant's "bare statement" that he is unable to afford medical treatment is insufficient to establish that inability). Because Taylor did not "identify any steps [he] took to obtain low cost medical care," and because "[he] did not testify that [he] was denied medical care because of [his] financial condition," the ALJ properly discounted his credibility because of his lack of medical treatment since March, 2007. Weaks v. Shalala, 1993 WL 498046, at *1, 12 F.3d 1104 (8th Cir. 1993) (unpublished table opinion); see also Carrigan, 2009 WL 734116, at *7.

The ALJ also relied on the absence of restrictions imposed by an examining physician on Taylor's ability to work because of his alleged impairments. (Tr. 14.) That an examining physician did not "submit[] a medical conclusion that [he] is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). Therefore, the ALJ did not err in discounting Taylor's credibility based on the lack of supporting objective medical evidence.

The ALJ also noted that Taylor "does dishes, watches television, and watches his children's ball practices." (Tr. 12.) Taylor testified that his mother does the dishes, and he only carries things in from the table to the sink; that he watches television and plays card games with his children, but usually sits or lays on the couch or lays in his bed while

watching television; and that he took his children to ball practice until his oldest child began driving. (Tr. 32-26.) Taylor also testified that when he sits, his leg goes numb from his knee to his ankle, and because he gets the most relief from the pain when laying down, he spends more than half of the day laying down. (Tr. 37.)

To the extent that the ALJ erred in relying on Taylor's daily activities to discredit him, because the ALJ also relied on the objective medical evidence, Taylor's lack of medical treatment, and lack of physician-imposed restrictions, substantial evidence supports the ALJ's credibility determination. Dodson v. Astrue, 346 Fed. App'x 123, 124 (8th Cir. 2009) (per curiam).

Therefore, the ALJ's credibility finding is affirmed.

**B. Vocational Expert**

The ALJ relied on the Grids instead of calling a VE in determining that Taylor was not disabled. (Tr. 14-15.) Taylor argues that the ALJ was required to call a VE because he alleged disability due in part to a nonexertional impairment: pain. (Doc. 17.)

When the ALJ determines that a claimant cannot perform his past relevant work, the burden shifts to the Commissioner to prove that there is work in the national economy that the claimant can perform. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005); 20 C.F.R. § 404.1560(c). If the ALJ finds the claimant has only exertional impairments, the Commissioner may meet this burden by referring to the Grids. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). If the ALJ finds the claimant suffers from a nonexertional impairment, the Commissioner may meet this burden only if "the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). See also Lowry v. Astrue, No. 2:09 CV 292 MLM, 2010 WL 1221780, at *10 (E.D. Mo. Mar. 30, 2010).

However, if the ALJ finds the claimant has a nonexertional impairment, and the impairment diminishes the claimant's capacity to perform the full range of jobs listed in the Grids, the Commissioner must solicit testimony from a VE to show the claimant has the capacity to work

in the national economy. Robinson, 956 F.2d at 841. A nonexertional impairment is any limitation, besides strength, which reduces an individual's ability to work. Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992). Pain and mental impairments are two such limitations. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

In this case, the ALJ determined that Taylor's impairments and resulting symptoms prevent him from engaging in strenuous activities, including his past relevant work of a punch press operator. But, after discrediting Taylor's testimony based on the objective medical evidence and his lack of treatment (Tr. 14), the ALJ found that Taylor could perform sedentary work activities.

As discussed above, substantial evidence supports the ALJ's determination that Taylor's nonexertional limitation did not significantly limit his ability to perform sedentary work. Thus, the ALJ properly relied on the Grids, including finding that Taylor was not disabled. See Bogard v. Barnhart, 159 Fed. App'x 737, 738-39 (8th Cir. 2005) (per curiam) (because "the ALJ found that the pain did not diminish [the claimant's] ability to perform the full range of light activities, . . . reliance on the Grids was proper . . ."); Dodson, 124 Fed. App'x at 124 (because "[t]he ALJ properly discredited the alleged extent of [the claimant's] pain, . . . he was not required to include related nonexertional limitations in his RFC determination, [and] . . . [i]t was therefore proper for the ALJ to rely on the Grids to find [the claimant] not disabled"); see also Kriebaum v. Astrue, 280 Fed. App'x 555, 559 (8th Cir. 2008) (unpublished).

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 26, 2011.